ALEXANDER H. HANDLAN, Appellant, v. EMMA
WYCOFF, Administratrix, et al.

ALEXANDER H. HANDLAN, Appellant v. MARGAR-
ET McMAHON, Administratrix, et al.

In Banc, April 29, 1922.

1. **ESTOPPEL IN PAIS:** Record Owner of Land: Confusion of Per-
sons: Special Tax Bills. Where plaintiff took title to land by a re-
corded deed to him in his name of "Alexander H. Handlan, Jr."
and thereafter, upon the death of his father, ceased to use the
suffix "Jr." and it was thereupon assumed by his son, whose name
was the same as plaintiff's, and they were both thereafter known
by those names respectively, plaintiff, merely by allowing the rec-
ord of his title to stand unchanged and by not giving notice that
he had discontinued the use of the suffix and that his son had as-
sumed it, was not estopped to maintain a suit to enjoin the levy
of executions upon said land, issued upon judgments enforcing the
lien of special tax bills, describing A. H. Handlan as owner and
issued for the cost of sewers, which judgments had been rendered
in suits against plaintiff's son, and to which suits plaintiff was not
a party. [McMahon Case.]

2. ———: ———: ———: ———: Advising Suit. Nor was plaintiff
estopped by the fact that, when he learned of the suits, he told
his son to "fight" them, such statement being unknown to the
plaintiff in such suits and not having influenced his action in any
way. [McMahon Case.]

3. ———: ———: ———: ———: One Not a Party or Privy Aiding
Defense. Even had plaintiff aided and abetted his son in the de-
fense of such suits by employing counsel or otherwise, of which
there was no evidence, he would not have been bound by the re-
sult of such suits or estopped thereby, inasmuch as he was not a
party of record to such suits or in privity with any of the parties
thereto. [McMahon Case.]

4. ———: ———: ———: ———: Proof of Estoppel Must be Certain:
Deception: Fraud. Where plaintiff, in 1886, took title to land by a

Handlan v. Wycoff & McMahon.

recorded deed to him in his name of "Alexander H. Handlan, Jr.,"
and in 1893, upon the death of his father, ceased to use the suffix
"Jr." and it was thereupon assumed by his son, whose name was
the same as plaintiff's, and they were both thereafter known by
those names respectively, and in 1908 special tax bills were issued
against said land by the city for part of the cost of sewers built
under contract with the city, and in said tax bills A. H. Handlan
was named as owner of said land, testimony by the attorney for
the contractor to whom said bills had been issued that in 1912 he
wrote three letters to A. H. Handlan demanding payment of said
tax bills, which letters were never answered, and that he there-
after presented the bills in person to plaintiff and demanded pay-
ment and that plaintiff said he had nothing to do with it and to
see his son about it, and that he saw plaintiff's son, who referred
him to his attorney who said it could not be disposed of without
suit, which statements plaintiff and his son denied, and that there-
after the attorney had the title examined and, finding it on record
in the name of Alexander H. Handlan, Jr., had the tax bills
amended by adding that name as owner and then brought suits on
such amended tax bills against plaintiff's son and the son's wife,
to which suits plaintiff was not a party, was not sufficient to sup-
port the defense of estoppel against plaintiff in a suit by him to
enjoin the levying of executions upon said land issued upon the
judgments rendered in said suits, as such evidence showed that
the attorney did not rely solely upon the statements of plaintiff,
and in addition thereto upon the evidence such statements were
ambiguous and not a clear and distinct assertion that plaintiff
did not own the land or that his son owned it.   [Wycoff Case.]

Held, by JAMES T. BLAIR, C. J., dissenting, with whom DAVID
E. BLAIR, J., concurs, that plaintiff's statement to the attorney
that he had nothing to do with the claim on the special tax
bill clearly implied that the property was not his, but was
his son's, and the attorney's examination of the record con-
firmed the implication, and the deception under the circum-
stances affords a basis for estoppel.

Held, by WALKER, J., that the son, when sued on the tax bills,
consulted plaintiff and was told to fight them, and thereupon
the son took upon himself the burden of the litigation and
assumed the role of owner of the property, and thereby gave
a semblance of sincerity to his defense until the action was
barred by limitations, and the course thus pursued was with
the knowledge and at the suggestion and for the benefit of
plaintiff, and therefore the plaintiff does not come into court
with clean hands, and is not entitled to the aid of a court of
equity in his suit to enjoin a levy of execution under the
judgments upon his property.

Appeal from St. Louis Circuit Court.—*Hon. G. A. Wurdemann,* Judge.

REVERSED AND REMANDED (*with directions*).

*H. A. Loevy* for appellant.

(1) The special tax proceedings are null and void as to appellant, because there was no suit against nor service of process therein on or appearance by appellant. The special tax judgments are clouds on appellant's title by reason of service of writs on another person of the same name and rendition of judgments thereon, in which case equity grants relief by injunction. Levy and sale under execution would take appellant's property without due process of law. U. S. Constitution, 14th Amendment; Mo. Constitution, art. 2, sec. 30. (2) No estoppel *in pais* is created by the evidence in these two cases: (a) Appellant did not take any part in the defense of the special tax cases, brought by both respondents against his son and the latters' wife. He merely told his son when the latter told him he (the son) had been sued, to "fight" the suit. (b) He was not an actual or record party to those suits. Womack v. St. Joseph, 201 Mo. 479; Perkins v. Goodin, 111 Mo. App. 439. (c) He would not be estopped in these injunction cases even if he had an interest in subject-matter of the tax bill suits. Perkins v. Goodin, 111 Mo. App. 442. (d) Nor because he had actual knowledge of the tax-bill suits from his son who was served. Greene v. Meyers, 98 Mo. App. 441; Siling v. Hendrickson, 193 Mo. App. 385; Kingston Case, 204 Mo. App. 700; Meyers Case, 126 Mo. App. 549; Bank v. Suman, 70 Mo. 533; Wilson v. Ry. Co., 108 Mo. 596; Harness v. Ry. Co., 120 Mo. 249; 21 R. C. L. 1263; Young v. Downey, 150 Mo. 326; Tourville v. Wabash, 61 Mo. App. 533. (e) Nor even if he had been present at the trials thereof. Lee v. Short, 149 Iowa, 345. (f) Nor even if he had employed counsel to assist his son or testified as a witness in his favor or given other active support in the tax-bill cases in court. He would not there-

by become a party to the record or become bound by the judgments therein. State ex rel. Kane v. Johnson, 123 Mo. 54; Loftis v. Marshall, 134 Calif. 394; Williamson v. White, 101 Ga. 276; Lee v. School Dist., 149 Iowa, 345; Cockins v. Bank, 84 Neb. 624. (g) Nor was he estopped by his son's (the only and actual defendant in the taxbill cases) informing him of the suits. Tourville v. Wabash, 61 Mo. App. 533. (3) There was no evidence that appellant deliberately, intentionally and with the fraudulent purpose of misleading Mr. Rodgers, told him in Wycoff's case that the Kirkwood property belonged to his son and that he did not own it. Unless that is shown, there is no estoppel: (a) There must not only be a false statement with intent to deceive, but it must have been made purposely and intentionally. DeBerry v. Wheeler, 128 Mo. 90. (b) To operate as an estoppel the act must have been with the intent that the other party should act on it. Trust Co. v. Horn, 83 Mo. 114; Burk v. Adams, 80 Mo. 504; Bigelow Est. 682; Delaschmutt v. Taylor, 261 Mo. 443. (c) And intent by the person disclaiming title that the other party will act upon it must be shown. Ford v. Fellows, 34 Mo. App. 632.

*Rodgers & Koerner* for respondent.

(1) Judgment recovered in an action on a special tax bill to which action the record owner of the property described in the tax bill is made defendant, is a valid lien on said property. Vance v. Corrigan, 78 Mo. 94; Rothenberger v. Garrett, 224 Mo. 197; St. Joseph v. Forsee, 110 Mo. App. 130. (2) One who deceives another into believing a certain state of facts to exist and to act on such belief is estopped from thereafter denying the truth of such facts. Lumber Co. v. Craig, 248 Mo. 319; Guffey v. O'Reilly, 88 Mo. 429. (3) Estoppel may arise from silence where there is a duty to speak, as well as from affirmative words or conduct. Pelkinton v. Ins. Co., 55 Mo. 172; Palmer v. Welch, 171 Mo. App. 597. (4) One who clothes another with the appearance of

ownership of property is estopped from afterwards claiming ownership in himself to the detriment of a party who acted in reliance upon such appearance. Zehner v. Stark, 248 Mo. 39; Mangold v. Bacon, 229 Mo. 459; 16 Cyc. 762. (5) Where A aids B in deceiving C into believing that certain property is owned by B, and into acting on that belief, A is estopped from thereafter asserting title in himself as against C. State to use v. Potter, 63 Mo. 226; Bigelow on Estoppel (6 Ed.) p. 651. (6) He who comes into a court of equity must come with clean hands. Seibel v. Higham, 216 Mo. 137; Creamer v. Bivert, 214 Mo. 485; Miller v. Kelsay, 114 App. 605. (7) He who seeks equity must do equity. 1 Pomeroy's Eq. Jur. (3 Ed.) p. 637, sec. 385; Black v. Early, 208 Mo. 311; Cravens v. Moore, 61 Mo. 178; 16 Cyc. 143.

HIGBEE, J.—These actions are to enjoin the levying of executions on separate special judgments recovered by John F. McMahon and Robert Wycoff, respectively, on tax bills for the construction of sewers in Kirkwood, St. Louis County. The cases were tried as one in the circuit court. Plaintiff appealed from a judgment dismissing the bills. For the history of these cases see Kirkwood v. Handlan, 182 Mo. App. 626, and State ex rel. Kirkwood v. Reynolds, 265 Mo. 88.

The petition states in substance that appellant bought the property in 1886; that deeds were made to A. H. Handlan, Jr., which was his name at the time; same were at once recorded; that he alone has been the owner ever since; that his father, bearing the same name, died in 1893, and appellant then ceased using the suffix, and his son in turn adopted it, that tax bills were issued against his property to contractors McMahon and Wycoff, suits brought by them and prosecuted as herein stated, and resulted in *certiorari* and quashal of judgment of the Court of Appeals, and issue of execution in McMahon Case and threat to issue in Wycoff Case; that such judgments, by reason of similarity of defendant's name with his, were clouds on his title and prays that enforcement of execution by sale be enjoined.

The answer of McMahon admits the issue of the tax bills July 19, 1907, in each of which A. H. Handlan was named as owner; that suits were brought and writs served on A. H. Handlan, Jr., and Ella, his wife, in the city of St. Louis; that they did not answer or plead to the merits, but appeared solely for the purpose of contesting the jurisdiction of the court over their persons; denies that plaintiff has ever since 1886, or at any time, been the only record owner of said property; admits plaintiff was not made a defendant in said suits to enforce said tax bills; admits McMahon has caused executions in said causes to be issued, directed to the sheriff of St. Louis County, and that said sheriff, unless restrained, will execute said writs; denies that said tax bills, suits and judgments are clouds on plaintiffs's title; denies that plaintiff has any title to said property or, if he has, said judgments and tax bills are valid liens; avers that the record title to said property was vested in Alexander H. Handlan, Jr., at the time of the issuance of said tax bills; that at said time plaintiff was not known by that name, but his son was the only person identified by that name; that said suits were brought in reliance on said records against plaintiff's son and his wife, Ella, who appealed from the judgments rendered in said suits to the St. Louis Court of Appeals, where the judgment was reversed and the reversal was quashed by the Supreme Court; that said Handlan, Jr., and his wife appeared in all of said proceedings by the attorney now representing plaintiff; that plaintiff had full knowledge at the time of the issuance of said tax bills and proceedings to enforce them and of all the steps taken by the said Alexander H. Handlan, Jr., and stood silently by during all of said time and made no claim to said property until more than five years had elapsed after the issuance of said tax bills; that plaintiff, knowing his son had assumed the name of Alexander H. Handlan, Jr., and that plaintiff was no longer known by that name, failed and neglected to give any notice on or by the records of St. Louis County that said property belonged to him, and that by permitting said property to remain

in the name of Alexander H. Handlan, Jr., plaintiff held out and represented to the public that the title thereto was vested in his son; that defendants herein have acted in reliance upon said records and upon the implied representations of plaintiff thereby so made and have been put to large expense, all with plaintiff's knowledge, and plaintiff has stood by silently until he deemed said tax bills barred by limitation. Wherefore he is estopped, etc.

The answer in the Wycoff Case is the same, except (1) that the only defendant in his suits on the tax bills was Alexander H. Handlan; (2) that issue of execution by him on his tax-bill judgment was threatened and special plea of estoppel by alleged misrepresentation by appellant, that his son and not he was the owner of the property.

The reply in each case was a denial of new matter.

In 1886, plaintiff bought three adjacent tracts in Kirkwood, aggregating about eighteen acres. His deeds were recorded at once. He was then known as Alexander H. Handlan, Jr., to distinguish him from his father who had the same name. The deeds were taken to him in that name. At that time, 1886, plaintiff had a son having the same name, then thirteen years of age. When plaintiff's father died in 1893, plaintiff dropped the suffix and his son assumed it and they have ever since been known by those names, respectively. Shortly after his father's death, plaintiff notified the assessor to change his tax bills by dropping the suffix. Thereafter, sometimes his name appeared in the tax bills without, and sometimes with, the suffix. Plaintiff came to the city of St. Louis in 1865, and since that time has been the owner of the Handlan-Buck Manufacturing Company. His wife's name is Mary, and his son's wife's name is Ella. They lived in the city of St. Louis, but in different residences. The father has been president of the company, and since his son's majority the latter has been secretary and general manager thereof. In 1904, plaintiff's health failed, so that since that time he has spent about ten months in each year traveling, his business being attended to by his son.

In 1907 and 1908, the city of Kirkwood ordained the construction of sewers, one to the south, the other to the north, of plaintiff's property. The contract for one was awarded to McMahon, the other to Wycoff. Three special tax bills, aggregating $918.91, were issued to Mc-Mahon as contractor, in which A. H. Handlan was named as owner. Wycoff's bills also named A. H. Handlan as owner, and were afterwards amended by adding the name of Alexander H. Handlan, Jr., also as owner. Both contractors delayed suit on the tax bills until the five-year period had nearly expired. McMahon employed Judge Hodgdon to collect his tax bills, and suit was brought in the Circuit Court of St. Louis County against Alexander H. Handlan, Jr., and his wife, Ella. Wycoff retained Rodgers and Koerner, who sued the same parties in the same court on his tax bills. In each case the writs were served on plaintiff's son and his wife by leaving copies at the residence of the plaintiff's son in the city of St. Louis. It is admitted that plaintiff was not a party to nor served with process in either case.

The only issue of fact is in the Wycoff Case. Mr. Rodgers, one of Wycoff's attorneys, testified: "In the year 1912, I wrote plaintiff relative to the payment of the tax bills, addressing him at his office by the name of A. H. Handlan, and, receiving no response, I called on him in person at his office and presented the tax bills, demanding payment. I don't know that I had any conversation with Handlan, Junior, but after I talked with his father and before bringing the suit, I took it up with him and he referred me to Mr. Loevy. He told me it could not be disposed of without bringing suit. I then asked for a title examination and had the special tax bills amended so as to put A. H. Handlan, Jr., in the bills and instituted the suit. I brought the suit against A. H. Handlan, Junior, because the title showed the property in his name, and A. H. Handlan had given me to understand that he was not interested in it and therefore I sued A. H. Handlan, Junior, without suing A. H. Handlan. A. H. Handlan, Jr., did not tell me he had nothing to do with it."

Mr. Rodgers, on cross-examination, said: "I don't remember that he used words that he did not own the property, but that is about the substance. Q. That answer don't satisfy me. I want you to tell me what he said, word for word. It is the most ridiculous thing for Mr. Handlan to say that he did not own the property? A. As far as I can recollect, he used the words: 'that he had nothing to do with it, and to see his son about it;' and he talked some more about it on the subject and what more he said, I don't remember."

Plaintiff testified that he did not remember seeing the work construction, but that he knew of it and declined to let the contractors cross his premises; that he did not know the contractors or who they were; that he knew McMahon by sight, and did business with him in the store; that he did not remember having any correspondence with anyone about the tax bills, or that anyone spoke to him about them; that whenever a tax bill was called to his attention, he OK'd it and it was paid by the store; that it cost him about $10,000 a year in taxes. His son told him he was sued for these tax bills. "I said, fight it;" that he didn't remember anything else he said about it. "I knew I was the owner of this property and that it stood in the name of Alexander H. Handlan, Junior, and that since my father's death, my son was the only person identified by that name . . . I have been away from home, maybe, ten months in the year for the last ten or twelve years. My son said the suit was on and he took an appeal. I don't remember that he told me what became of the appeal. I think he told me that it went to the Supreme Court and we were defeated, and it was referred back to this court. My son told me that execution was issued. He said he would have to enjoin them selling that property. I must have been in town then. I don't know about correspondence with Rodgers and Koerner about this tax bill. There may have been a letter or two, I don't remember."

A carbon copy of a letter, dated November 23, 1912, addressed to A. H. Handlan, 212 North 3rd St., City, advising him that plaintiff's attorneys have for collection

three special tax bills in the sum of $34.59, $51.20 and $61.12, issued January 16, 1908, against plaintiff's property in Kirkwood for constructing sewers, etc., was read in evidence. Carbon copies of letters of December 4th and 16th, to the same address, were also read in evidence.

Witness said he was seventy-five years of age, memory not as good as when he was younger; that if they were addressed to him he must have received them, but did not remember. Mr. Rodgers never called on him; that the first time he met Mr. Rodgers was when he went over there to take the deposition in these cases. "When I went in there Rodgers said I was 'not the man I met' when I called on him.' I never saw him before. The depositions were taken at his office."

A. H. Handlan, Jr., testified that the writs in these cases were left at his house; that he assumed the suffix, "Junior," on the death of his grandfather in 1893, and his father quit using it then; that he never had any interest in the Kirkwood property, nor paid any taxes on it. On cross-examination: that he first heard of these tax bills when the writs were served; that he had no correspondence with anyone with regard to them before these suits; was not sure, didn't remember; that he didn't believe he reported the matter to his father, but turned them over to Mr. Loevy; that his father did not suggest that he call in Mr. Loevy; thought his father was out of town, and probably told him later on when he visited his father in the summer; that he didn't remember what he said, but that Mr. Loevy had been fighting sewer tax cases for his father for a number of years. "I was not interested so far as I could see. I turned it over to him to handle for myself. We merely raised the point that we had been served in the city of St. Louis. I told Mr. Rodgers that I did not own the property. I remember that because it seemed so ridiculous to serve it on me after I told him. I told him that when he was in the store. I don't remember when that was; it was when he came in there to see about collecting or service, I forget now which. I know the case went to the Court of Appeals and to the Supreme Court.

There has been no expense, except some miscellaneous bills that I paid, court expenses and printing, stenographers and traveling. I paid them. I did not want the judgment hanging over me. I had to do something. Never asked my father to reimburse me. Don't remember writing Rodgers & Koerner any letters about the tax bills.

I. We are unable to find any support for the contention that plaintiff had allowed the title to the property to stand in the name of his son and had so encouraged the contractors to expend their money in the construction of the sewers on the faith of the son's ownership. It is alleged in the answers that the defendants acted in reliance upon the records and upon the implied representations of plaintiff thereby so made, but there is no proof that they ever knew who the owner was or that the record was examined until about the time the Wycoff suit was brought. As a matter of fact, the contractors are not supposed to have any knowledge of the names of the property owners; they are not concerned about that; they made the improvements on the faith of the ordinances and the lien the law gave them, after which they received tax bills which advised them of the name of the property owner. There is no evidence in the record to support this claim. The only claim in that connection is that when the lien of Wycoff's tax bills had nearly expired by limitation, his attorneys wrote plaintiff three letters demanding that he pay the bills and that thereafter, when Mr. Rodgers, one of plaintiff's attorneys, presented the bills for payment, plaintiff told him he had nothing to do with it and referred him to his son, which we will discuss later. The clear implication is that up to that time Wycoff had understood that plaintiff was the owner, as Rodgers had written him demanding payment of the bills. Moreover, plaintiff testified he refused to allow the contractors to cross his property. That was probably during the time the work was being done. Respondents have not suggested how plaintiff

*Estoppel: Implied Representations.*

could have changed the record of his deeds, nor how he could have given notice that he had discontinued the use of the suffix and that his son had assumed it. Plaintiff's deeds had been recorded twenty-one years before the first set of tax bills were issued. In view of this fact and the further fact that all the tax bills named A. H. Handlan as owner, the clear inference, is that the contractors were advised during the years they held the bills that plaintiff, in accordance with the general custom, had discontinued the addition to his name. They had five years within which to learn the name of the owner.

II. As previously stated, all the tax bills named Alexander H. Handlan as owner; that the Wycoff bills were amended before suit by adding the name of Alexander H. Handlan, Jr., as owner; the McMahon suits were against Alexander H. Handlan, Jr., as defendant, and the Wycoff suits were against him and Ella Handlan, his wife, as defendants. The writs were not served on plaintiff and he is admittedly not a party to the record. But it is claimed that plaintiff is estopped to question the contractor's liens by his conduct in the premises; that he suffered the title of record to the lots to remain in his son's name; permitted the contractors to expend large sums of money in the construction of the sewers and, when suits were brought against his son to enforce the lien of the tax bills, he encouraged him to contest the action, thus assuming the role of owner, and he and his son did all in their power to continue this deception until the tax bills were barred by limitation, and that he is now estopped from asserting ownership; that he who comes into equity must come with clean hands, and that a court of equity will not aid a party to commit a fraud.

*Estoppel by Conduct.*

So far as the McMahon Case is concerned, there is not a word that I have been able to find in the record to sustain this contention. The work was done pursuant to the ordinances without consulting the owners of the property and solely in reliance upon the lien of the

tax bills. It is admitted the ordinances were legal and authorized the construction of the sewers, and that the law gave the contractor a period of five years to enforce his liens by prosecuting actions against the owner of property within that period. Plaintiff never misled or deceived McMahon in any manner. He did not hold the property out as his son's, except by permitting the record of his deed to remain unchanged. It has not been suggested how that could have been remedied. But the record told the truth. Plaintiff never told the officers of the city or McMahon that it was his son's property. No one ever inquired of plaintiff about the ownership of the property. McMahon was not misled by them as to the ownership. The tax bills distinctly and officially advised McMahon that A. H. Handlan was the owner. Plaintiff sued the wrong man. That is all that can be said about it. It is true that when plaintiff's son told his father he had been sued on the tax bills, the plaintiff told him to "fight it," but that suggestion or admonition was unknown to McMahon and could not and did not influence his action. Of course, the law will not permit one to mislead another to his hurt with impunity. But that is not this case. McMahon does not claim that plaintiff violated any legal obligation to him in not advising him he had erred in suing his son. McMahon had appealed to Caesar, and plaintiff allowed him to proceed without suggestion or interference.

III. But it is claimed that plaintiff aided and abetted his son in the litigation and is bound by the judgment as much as if he were a party to the record. The record fails to show that he aided or abetted his son. It shows that he told his son to fight it. That is the head and front of his offending. When the plea to the jurisdiction of the court was overruled, no further contest was made and judgment went by default. But this court has held that if one, not a party to an action, participates in the trial thereof by employing an attorney to aid in the defense, he would not be bound by the result, not being a party to the rec-

Estoppel: Aiding Suit.

ord.   In State ex rel. Kane v. Johnson, 123 Mo. 43, 55, BURGESS, J., speaking for the court in Division Two, said:

"The relator was not a party to the suit by Ransom against Johnson and Gilmer, nor could he have appealed from the judgment rendered therein.   The mere fact that he employed attorneys to defend that suit, who participated in its trial and the examination of witnesses, ought not to estop him from now asserting his rights, as he claims nothing by, through or under them.   While relator might have become a party defendant to that suit, had he felt so inclined, he was under no obligations to do so.   If the purpose of the suit was to pass upon his rights he should have been made a party.   [Hope v. Mayor, 72 Ga. 246.]

"Samis v. King, 40 Conn. 298, was a suit by injunction to restrain the payment of salary to policemen not legally appointed, brought against the clerk, auditor and treasurer of the city, but the city itself was not made a party defendant, and it was held that it was not enough that the city assumed the defense of the case through its attorney; that the city was a necessary party, and that so long as it did not appear upon the record no decree could be passed against it.   [2 Spelling's Extraordinary Relief, sec. 975.]"

This is the uniform ruling in this State.   [Womach v. St. Joseph, 201 Mo. 467, 479, citing the Kane Case; Perkins v. Goddin, 111 Mo. App. 429, 438, et seq., Tourville v. Wabash Ry. Co., 61 Mo. App. 527, 533;   Elliott v. Penninger, 204 S. W. 188, 190;   23 Cyc. 1215, 1237.]

In 21 Corpus Juris, 1064, par. 22, it is said:

"As a judgment, on the other hand, the record has the further effect of precluding a re-examination into the truth of the matters decided; but in this aspect it is as a rule binding only upon the parties to the proceeding and their privies."

IV.   In the Wycoff Case the answer asserts that before suit was brought on the tax bills, plaintiff refused payment and told Wycoff's attorney that he did not own the property.   At the trial Mr. Rodgers, testifying sever-

al years after the alleged conversation, said: "I don't remember that he used the words that he did not own the property, but that was the substance." When asked to repeat the conversation word for word, the witness said: "As far as I can recollect he used the words 'that he had nothing to do with it and to see his son about it,' and he talked some more about it on the subject and what more he said about it I don't remember." ·

**Estoppel: Inference.**

Plaintiff distinctly denies ever having met Mr. Rodgers until he went to the latter's office to have his deposition taken and that when he entered the room Mr. Rodgers said, in substance, "I was not the man he met when I called on him." Plaintiff's son says Mr. Rodgers came to the store and that he told Mr. Rodgers that he did not own the property. After that Mr. Rodgers had the title examined. The record showed title, as we know, in A. H. Handlan, Jr., and Mr. Rodgers had the tax bill amended by adding the name of A. H. Handlan, Jr., as owner, and brought suit against him, saying he relied on the record title as also on plaintiff's statement.

Plaintiff did not tell Mr. Rodgers he did not own the property, nor is Mr. Rodgers clear as to the language used by Mr. Handlan. What did he mean by saying. "I have nothing to do with it?" If Mr. Rodgers by that statement understood plaintiff to mean that he did not own the property, was he justified in that conclusion, and did he rely on it? If so, why did he have the title examined? He felt obliged to do this, had it examined, and then added the name of A. H. Handlan, Jr., as owner—the name of the record owner.

· In 21 Corpus Juris, 1129, par. 130, it is said:

"If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely upon them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise."

"Before an estoppel can be raised there must be certainty to every intent, and the facts alleged to con-

stitute it are not to be taken by argument or inference. Nothing can be supplied by intendment. No one should be denied the right to set up the truth unless it is in plain contradiction of his former allegations or acts. If an act or admission is susceptible of two constructions, one of which is consistent with a right asserted by the party sought to be estopped, it forms no estoppel." [Par. 139, p. 1139.]

"Every fact essential to an estoppel must be clearly and satisfactorily proved. Estoppels cannot be based upon mere conjecture; and facts alleged to constitute them will not be taken by inference or intendment." [Par. 269, p. 1252.]

In Blodgett v. Perry, 97 Mo. 263, foot 273, SHERWOOD, J., said:

"Furthermore, there must be a *certainty* about the alleged estoppel; the misrepresentation must be plain, not doubtful or matter of mere inference or opinion; for the courts will not suffer a man to be deprived of his property or security where he had no intention to part with it. It is much the same thing to say that the representation or conduct is such as would naturally lead to the action taken; that is, it should be such as to justify a prudent man to act upon it. [Bigelow on Est. (3 Ed.) 490, 491.] Tested by these authorities, and the rule they enunciate, the plea was wholly worthless.

"And the evidence to support the plea of estoppel is of a piece with it, since it is clear that Shumate was acting under and relying *not on the act of the bank in having the sale made, but upon the advice of his counsel, F. M. Cockrell,* that his purchase under the second execution would be good, as the sale made thereunder would bar and estop the bank from asserting title under any former deed to the latter."

It does not appear that Mr. Rodgers inquired as to the identity of A. H. Handlan, Jr., the grantee in the deed recorded twenty-six years before he instituted suit on the tax bills, although he met both the plaintiff and his son and took the plaintiff's deposition. It is not unusual that in the course of the years intervening since the

execution of the deed that the grantee should have discontinued the use of the suffix. The name of the owner designated in the tax bills might have indicated as much. A little inquiry then would have cleared up the matter. When the evidence and circumstances are considered, we are clearly of the opinion that the case is lacking in the essential elements of an estoppel.

The judgments are reversed and remanded with direction to enter judgment for the plaintiff in each case, according to the prayers of the petitions. *Woodson, Graves* and *Elder, JJ.,* concur; *James T. Blair, C. J.,* concurs in part and dissents in part in separate opinion, in which *David E. Blair, J.,* concurs; *Walker, J.,* dissents, in separate opinion.

JAMES T. BLAIR, C. J. (concurring in part; dissenting in part).—The result reached in the case against McMahon seems to be correct. I do not agree to the disposition made of the Wycoff Case. The general rules respecting estoppel are to be applied with proper regard to the unusual situation in the case. Wycoff, in the beginning, was asserting his claim against Handlan. Handlan told Rodgers he had nothing to do with it.

**Estoppel: Deception.** This, in the circumstances, included (1) the clear implication that the property was not his, but (2) was his son's. The examination of the record upon which some stress is laid, on the face but confirmed what Handlan told Rodgers. Handlan knew his son was at the time known as A. H. Handlan, Jr., quite as well as he knew that his own title had been taken under the name of A. H. Handlan, Jr., before he doffed the suffix and the son took it up. The record, when read in the light of what Handlan told Rodgers, was in condition to make the deception of Wycoff certain. Handlan knew this. In such circumstances the examination of the records, so much relied upon in the majority opinion, does not fully let in the rule quoted therein. These things coupled with Handlan's direction to his son to "fight it" and other facts stated, afford a basis for estoppel. What has been said is based upon the as-

sumption that Rodger's testimony is true, and the record seems to me to leave no question on that head. I concur in the result in the McMahon Case and dissent from the result in the Wycoff Case. *David E. Blair, J.,* concurs herein.

WALKER, J. (dissenting).—I deem it proper to note the reasons of my dissent. I do not concur in the majority opinion in that the plaintiff's hands were clean and that he was therefore entitled to the aid of a court of equity.

The special tax bill on which this action was based was an action *in rem.* A personal judgment could not be recovered against A. H. Handlan, Jr., and there was nothing for him to accomplish by contesting it. When named in the action as the owner of the prop-

*Unclean Hands: Fraud.* erty, there was one of two honorable courses of action for him to pursue; either to disclaim ownership or ignore the action. Instead of pursuing either, he consulted with his father, A. H. Handlan, Sr., who advised him to "fight 'em." The former thereupon took upon himself the burden of the litigation. These Handlans, as the record discloses, were intelligent business men. The evident conclusion from these facts is that the father, realizing that the plaintiff McMahon had made a mistake in the name of the defendant, concluded that if the suit could be sufficiently prolonged the Statute of Limitations would bar the action, and the elder Handlan would reap the benefit of the improvement without cost to him. The younger Handlan, by contesting the suit, assumed the role of owner of the property, gave a semblance of sincerity to his defense until the action was barred. This course was pursued not only with the knowledge and at the suggestion but for the benefit of the father, A. H. Handlan, Sr.

The majority opinion states that the advice of Handlan, Sr., to his son to fight the suit was unknown to the plaintiff and did not influence his action. Let this be granted. This does not cleanse Handlan, Sr.'s, hands so as to entitle him to relief in a court of conscience.

"If," as the plaintiff pertinently says, "this be a correct construction of the province of a court of this character; then A can advise B to perpetrate a fraud and when brought to book to answer for it can say: 'Yes, I advised it, but C, upon whom it was perpetrated, did not have knowledge of it at the time, and hence I cannot be held liable."

With that temperate consideration which should be given to the opinions of those who differ with us, I cannot acquiesce in what I deem to be the approval of a palpable fraud. Hence the foregoing.